49 CCPA

## Application of Vannevar BUSH.
### Patent Appeal No. 6713.

United States Court of Customs and Patent Appeals.

Nov. 17, 1961.

Marcus Lothrop, San Francisco, Cal., Harry W. F. Glemser and Bacon & Thomas, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (R. E. Martin, Washington, D. C., of counsel), for Com'r of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of process claim 28 and article claim 29 in application Ser. No. 341,001, filed March 9, 1953, for "Glass Plastic and Method of Making the Same." Two process claims have been allowed.

The invention is an article of manufacture and a process of forming it. The

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28, United States Code.

process consists of first blowing a hollow, thin-walled glass shape such as a sphere or cylinder until it shatters, the resulting pieces being irregular in size, shape, and thickness, and generally slightly dished or curved. Glass in this state is aptly termed "foliated." Secondly, the fragments of foliated glass are screened, falling through the screen to be collected in a sheet-like series of layers. The sheet of glass laminae so formed is then impregnated with a fluid plastic binder which is cured to a solid state to complete the article.

An alleged advantage of producing a glass-plastic sheet in this manner lies in the sheet's strength in two directions at right angles to each other in the plane of the sheet.

The claims on appeal read as follows:

"28. A process of forming a structurally strong sheet comprising blowing a hollow, thin-walled glass shape until said shape shatters into thin fragments irregularly shaped and sized and substantially flat; *subjecting said fragments in shattered condition to a screening operation to pass smaller ones of said fragments through a screen and to retain larger ones of said fragments on said screen;* receiving said smaller ones of said fragments passing through said screen in shattered condition on a planar member in a flatwise orientation until a sheet made up of said smaller ones of said fragments in overlapping relationship is formed; and filling interstices between said fragments in said sheet with a plastic. [Emphasis ours.]

"29. As an article of manufacture, a planar sheet mechanically strong in two directions at right angles to each other in the plane of the sheet comprising a group of slightly curved, irregularly outlined, thin broken glass fragments in flake form having substantial length and width compared to their thickness, *said group being of flakes having*

*sizes and configurations to pass through a screen and being devoid of flakes having sizes and configurations to be retained on said screen,* and said flakes in said group being disposed substantially parallel to the plane of said sheet and substantially in contact with each other and with the curvature thereof being similarly oriented but leaving some interstices, and a substantially solid, glass-wetting plastic substantially occupying said interstices." [Emphasis ours.]

These claims were rejected as unpatentable over two references:

Whitney 726,485 April 28, 1903
Harth 2,233,259 February 25, 1941

In the final rejection, the examiner said:

"Claims 28 and 29 are *finally* rejected as unpatentable over either Harth or Whitney, both of record, either one alone, or both considered together."

In the examiner's answer, filed according to the rules, after the filing of the appellant's brief on appeal to the board, these claims were said to *"have been finally rejected"* [our emphasis] on the following three grounds:

1. unpatentable over Harth alone

2. unpatentable over Harth in view of Whitney

3. unpatentable over Whitney in view of Harth.

Nothing was said about withdrawing any ground of rejection.

The board, in sustaining the rejection, said it was unable to sustain the rejection on Harth alone, said "we need consider only the rejection based on Whitney in view of Harth," and then held the rejection to be "sustainable on Whitney alone."

In view of the foregoing procedural facts appellant suggests the necessity of "a prefatory ruling by this court," apparently on the question whether the board's rejection on Whitney "is proper,"

meaning legally permissible. The assumption seems to be that the board did not affirm the rejection on Whitney in view of Harth but rejected on Whitney alone.

We think that the requested ruling will be better understood if it is made after a discussion of the references.

The 1903 patent to Whitney contains a brief description, of less than one page, of "insulating material," which would appear to be electrical insulation. (The patent was assigned to General Electric Company and no mention is made of any other kind of insulation.) The material is also described as an article of manufacture in the form of a plate, being so shown in the drawing. This material consists of exceedingly thin glass flakes or sheets and a binder. The patent thus describes the production of the glass flakes:

"Fig. 1 shows a bulb of blown glass, the blowing of which has been continued until the walls of the bulb have been so reduced in thickness that the bulb has commenced to break into sheets or flakes, as indicated. In practice the bulb when it has reached this condition of extreme thinness is broken or shattered into numbers of films or thin sheets, which as they fall may be collected in a suitable receptacle."

It is clear that Whitney produces the kind of thin, broken, glass fragments in flake form referred to in the first clauses of appellant's claims 28 and 29 and produces them in the same way as appellant. The same is true of the "foliated glass" referred to in the Harth patent as follows:

"In accordance with the present invention, glass is attenuated until it reaches a foliated condition, in which the glass is in the form of leaves, thin plates or laminae. This may be accomplished in an illustrative manner, by blowing the glass into a bubble until it breaks or fractures. Upon such attenuation and fracturing, the glass becomes foli-ated and in the form of extremely thin, flat leaves, plates, or laminae, which may be as small as a micron in thickness. Such foliated glass now has distinct properties and characteristics, enabling its employment in the various arts."

It is not open to dispute that this is the very same kind of glass referred to in appellant's claims and described in his specification, for applicant uses the same blowing and bursting technique to produce his glass fragments.

Whitney's plate of insulating material is formed from the foliated glass by combining it with "a suitable flexible binding material, such as shellac, boiled linseed-oil, paraffin or other wax, or the like." He specifically describes a process of impregnation with paraffin-wax, heated to fluidity, and allowed to flow into the interstices between glass flakes in the form of a layer, which layer is pressed if desired, and then allowed to dry and harden.

It is clear to us that this Whitney disclosure meets the terms of claims 28 and 29 which call for "filling interstices between said fragments in said sheet with a plastic" or with a "substantially solid, glass-wetting plastic." It is not disputed that Whitney's impregnating materials meet the term "plastic."

The corresponding relevant disclosure in Harth, whose primary interest seems to be the making of paint, for which purpose he grinds up his foliated glass, is in the following description of an additional use:

"In employing the foliated glass as an [electrical?] insulating material, a suitable insulating foliated glass, as above described, may be mixed with any suitable synthetic resin, so as to secure an insulating compound. Such foliated glass is also suitable for use as a heat insulating material without necessarily being finely divided * * *."

Whitney also shows receiving glass fragments on a planar member in "flatwise orientation," as stated in claim 28.

The fragments would necessarily overlap unless one took pains to arrange them in discrete piles. Claim 29 specifies further that the flakes are disposed "with the curvature thereof being similarly oriented." The only way appellant accomplishes this is by permitting the curved flakes to fall freely onto a surface. He says:

"Because of the slight curvature, the fragments * * * tend to fall flatwise with the convex side down and eventually are intercepted on a fine screen 11, such as a bronze mosquito wire, resting on a suitable support 12. * * * The fragments 13 are in somewhat random arrangement on the screen 11 but in any event form a sort of sheet 14."

Whitney shows his fragments resting "spread evenly over the bottom of" a tray made of screen. Whitney's flakes have a substantially "flatwise orientation" which is all claim 28 requires.

Claim 29 calls for the curvature of the flakes being "similarly oriented." We read this on appellant's disclosure, above quoted, that the flakes fall "flatwise with the convex side down" though in "somewhat random arrangement." But we feel that as a claim limitation its significance must also be judged on the basis of appellant's statements in the concluding paragraph of his specification that his glass fragments are "substantially *flat* and approximately *planar,* or only *slightly* curved" and "arranged with substantially the same *general* orientation." [Emphasis ours.] These being the facts underlying the "similarly oriented" limitation, it is not believed to patentably distinguish from Whitney. Even if Whitney does not disclose all curvatures in the same direction, appellant does not show that meeting this limitation would make any real difference, especially when all flakes are pressed flat in the final product.

The only argument left to appellant to show that his claims distinguish from the prior art in some unobvious and significant feature, and the matter which has been principally argued, relates to those portions of the claims which we have italicized. These passages recite screening of the foliated glass fragments, in claim 28 as a process step and in claim 29 as a sort of product-by-process limitation on one element. In both claims it is in effect stated that the glass fragments incorporated in the final article are those *which will pass through a screen,* exclusive of fragments which will not. The board said:

"The recitation that the smaller fragments pass through the screen and the larger ones are retained *is not a restrictive or significant limitation* absent a recitation of the screen mesh or dimensions of the fragments exclusively permitted to pass through." [Emphasis ours.]

We fully agree. For aught that appears in the claims, the fragments or flakes passed by the screen could include all of those which appellant says in his specification and brief he wishes to exclude, namely those which are so thick as to be prone to crack when flattened because they lack the flexibility of the thinner flakes, thickness being equated empirically by appellant with some undefined size referred to as "too large."

In appellant's specification the explanation of this matter is as follows:

"Those of too large a size are held back whereas other fragments of a size to pass the screen, say about one square centimeter in area, continue to fall therefrom by gravity. *Reference to fragments of too large a size is not intended to refer so much to the area of the fragments as it is to the thickness.* Large area as such is not now considered to be harmful but it *usually* is accompanied by excessive thickness, a thickness so great as to impair the flexing and flattening of the particles. Hence, the sizing screen 9 is intended to represent diagrammatically *a means of holding back harmful or undesired particles.*" [Emphasis ours.]

Appellant's brief says:

"It is for the skilled artisan, having been told by appellant to *exclude relatively inflexible, weak flakes* by screening, to exercise the skill of his calling and to use whatever screen size is appropriate to the particular flexibility requisite in any one case. The appellant having pointed out the general relationship between size, strength and flexibility, a *vital relationship* not taught in the references, *need give no dimensional values or figures and has not done so.* He has offered an example by way of explanation." [Emphasis ours.]

In the final analysis, what all this comes to, it seems to us, is that appellant asks us to interpret the "screening" step in his appealed claims to mean that in his article, or in his process of making it, he excludes the too thick, too inflexible fragments which are liable to crack when flattened, and which in this sense are weak and undesirable. This would be reading a lot into the claims that is not there. In the brief it is summed up by saying that the screening step, which is not to be found in Whitney,

"* * * is of a patentable nature because this extra step affords differentiation between fragments which are thin, flexible and strong and those which are thick, inflexible and weak. While this distinction is relative rather than dimensional, it is nevertheless a distinction and an inventive one and a patentable one since the appellant's desired result '* * * an exceedingly strong structural member * * *' * * * is thus attained whereas Whitney merely provides insulation or coating material."

We do not find this argument persuasive. There is nothing about coating material in Whitney. In "merely" providing insulation, Whitney uses the very foliated glass fragments defined in the claims. They possess certain inherent strength characteristics. The screening limitations of the claims in no way indicate that "thin, flexible and strong" fragments are passed through the screen while "thick, inflexible and weak" fragments are not. If that is the supposed distinction between what Whitney discloses and appellant's invention, it does not appear from the passages in the claims relied on, which describe only separating the flakes above some undefined size from flakes below that size. Appellant himself says that large size is not necessarily to be equated with "harmful or undesired particles." We are not able to find anything unobvious in a step which is to be read as the exclusion of unwanted fragments in the absence of anything more specific than unspecified size to show why they are unwanted, especially when it is not size itself that is undesirable.

█ A rejection of claims 28 and 29 as unpatentable over Whitney alone seems fully justified. The only difference between this rejection and a rejection on Whitney in view of Harth is that in the later the Harth reference is used for a disclosure of the step of screening in the foliated glass art. As we said, Harth seems primarily interested in making paint containing finely-divided glass flakes. He obtains them by grinding up the foliated glass and then screens it to get whatever size he wants. The only specific size mentioned is a comminuted product which will pass a 325 mesh screen (325 wires per lineal inch). So far as the screening steps per se of appellant's claims are concerned, they would read on Harth whose screen, whatever its size, would retain particles above a certain size and configuration and pass those below it. This being true of any screen, and size differentiation by screening being such a common expedient in many arts that we can take judicial notice of it, Harth seems a superfluous addition to Whitney in making the rejection.

### Right to Reject on Whitney Alone

We will now give the "prefatory ruling" requested by appellant. The question in essence is this: After a final rejection rejecting on Whitney alone and

on other reference combinations and an examiner's answer which failed to mention but did not withdraw the rejection on Whitney alone, did the board have the *right* to reject on Whitney alone?

Appellant makes an ingenious argument:

A. Under Rule 196(a), Patent Office Practice Rules, 35 U.S.C.A.Appendix the board can affirm "on the grounds * * * *specified* by the examiner." Since the examiner's answer did not *specify* the rejection on Whitney alone, that ground was outside Rule 196(a).

B. Under Rule 196(b) the board can make its own rejection on "any grounds *not* involved in the appeal." Since the rejection on Whitney alone "was in the Final Rejection, it was 'involved in the appeal' and so outside Rule 196(b)."

C. Wherefore, argues appellant, the board "had no authority to consider" the rejection on Whitney alone because it was outside both parts of Rule 196.

Ruling: (1) Appellant cannot have it both ways. If we are to look to the final rejection, rather than the answer, to see what rejections are *involved* in the appeal, that is where we should look to see what grounds of rejection the examiner has *specified*. Appellant admits the final rejection included a rejection on Whitney alone. We must, therefore, rule against him.

(2) The court looks on this form of argument as sophistry and regards it with disfavor. Furthermore, the answer specified a rejection on Whitney in view of Harth and if the board found it *unnecessary* to rely on Harth in sustaining that rejection, as it appears to have done, that does not amount to rejection on a new ground.

■ The simple question in this case is whether the claims define patentable

invention over two rather simple references. That issue was made clear to the applicant by the examiner. He stated it in every possible way in the final rejection in the sentence we quoted above. In restating the grounds on which the claims *had been* rejected, the examiner's answer failed to mention one of those ways but did not withdraw it. In applying Rule 196(a), it seems to us that the words "grounds * * * specified by the examiner" must be construed to include all grounds relied on at final rejection and not clearly withdrawn by the examiner's answer, notwithstanding what appears to be an office practice (which may find support in M.P.E.P. 1208) to regard grounds of rejection not *repeated* in the answer as withdrawn by implication.

■ In a case of this type where a rejection is predicated on two references each containing pertinent disclosure which has been pointed out to the applicant, we deem it to be of no significance, but merely a matter of exposition, that the rejection is stated to be on A in view of B instead of on B in view of A, or to term one reference primary and the other secondary. It would perhaps have saved much argument of the kind we have before us if the Patent Office had stayed with its rejection of the claims as unpatentable over A and B "considered together" and had merely stated its reasons for such rejection without formal alinement of the references. Fifteen years ago this court pointed out in In re Cowles, 156 F.2d 551, 554, 33 CCPA 1236, that such differing forms of expression did not constitute different grounds of rejection, were of little consequence, and that basing arguments on them was "attempting to make a mountain out of a mole-hill."

The decision of the board is affirmed. Affirmed.