Application of Richard SICHERT.

No. 77–546.

United States Court of Customs and Patent Appeals.

Decided Dec. 15, 1977.

Argued Oct. 7, 1977.

Blythe D. Watts, Cleveland, Ohio, for appellant; James G. Watterson, Chagrin Falls, Ohio, of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Gerald H. Bjorge, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) rejecting claims 1–21 in application serial No. 360,935,[1] filed May 16, 1973, for "Therapeutical Composition." We reverse the rejection of claims 2–4, 6–8, 12, 13, 15, 16, 18, and 19, and affirm the rejection of claims 1, 5, 9–11, 14, 17, 20, and 21.

---

1. A continuation-in-part of application serial No. 43,947, filed June 5, 1970.

## THE INVENTION

The therapeutical compositions embraced by the claims comprise mixtures of extracts from plants of the Umbelliferae, Liliaceae, Berberidaceae, and Solanaceae families (one extract per family) and an extract of a plant which has a tonic effect on the heart.[2] Claims 1 and 2 are exemplary:

1. A composition of matter for treating lymphatic congestions comprising a mixture of

(a) an extract of Umbelliferae,

(b) an extract of Liliaceae,

(c) an extract of a plant selected from the group consisting of Digitalis, Strophanthus, Convallaria and Crataegus,

(d) an extract of Berberidaceae, and

(e) an extract of Solanaceae, the ratios of a) : b) : c) : d) : e) being about 4 to 12 : 2.8 to 9 : 2 to 6.5 : 2 to 6 : 2 to 7.5.

2. The composition of matter set forth in claim 1 comprising a mixture of:

(a) an extract of an Umbelliferae selected from the group consisting of Conium maculatum, Cicuta virosa, Aethusa cynapium and Oenanthe crocata,

(b) an extract of a Liliaceae selected from the group consisting of Colchicum autumnale, Veratrum album, Aloe and Asparagi,

(c) an extract of a plant selected from the group consisting of Digitalis, Strophanthus, Convallaria and Crataegus,

(d) an extract of a Berberidaceae selected from the group consisting of Podophylli and Berberis vulgaris, and

(e) an extract of a Solanaceae selected from the group consisting of Hyoscyami, Atropa belladonna, Mandrogorae and Datura stramonium,

the ratios of extracts (a), (b), (c), (d) and (e) present being, respectively, about 4 to 12 : about 2.8 to 9 : about 2 to 6.5 : about 2 to 6 : about 2 to 7.5.

The specification discloses that the compositions are useful "against congestions in the lymphatic system" and explains that—

Lymphatic congestions are the *cause of* many diseases. The mixtures according to the invention have a superior activity *against these congestions.* They are also applicable prophylactically. *By regularly applying them the clogged lymphatic vessels and lymphatic clefts are drained to such an extent that a normalization of the lymph current in the vessels and tissue clefts is recovered.* In such a way the lymphatic congestions, the swelling of tissues and indurations as well as the dolor syndromes connected with them disappear in a short time more or less depending on the severity of the case. [Emphasis added.]

The modes of application of the compositions include oral, rectal, or parenteral, and the compositions may be in the form of capsules, suppositories, solvents, ointments, ampules, or an inhalation spray.

Dependent claims include the additional ingredients of an "ointment base," "potassium arsenite," and a "sulphur-containing amino acid." Claims 5, 14, and 20 are representative:

5. The composition of matter comprising the mixture of extracts set forth in claim 2 and from about 76.1 to about 83.3% of ointment base.

14. The composition of matter comprising the extracts set forth in claim 2 and between about 3% and about 35% of potassium arsenite.

20. The composition of matter comprising the mixture of extracts set forth in Claim 2 and from about 76.1% to about 83.3% of an ointment base containing linoleic acid in combination with a sulphur-containing amino acid and the biocatalyzer cytochrome C.

## THE REJECTIONS

The board sustained the examiner's rejections of claims 1–21 under 35 U.S.C. § 101 for lack of proof of utility and under 35 U.S.C. § 112 for lack of enablement. The

---

**2.** The trade name of the commercial embodiment of the invention is "Unguentum Lymphaticum."

basis for these rejections was the underlined portion of the claim recitation: "A composition of matter for treating <u>lymphatic congestions</u> . . . ." Thus, the board summarized the examiner's position (with which it agreed) as follows:

> The examiner's position is that the expression "lymphatic congestions" is undefined in the specification and does not appear to define a specific condition, but rather to describe a symptom which can be associated with an extremely large number of pathological conditions of varying etiology. The examiner's position is further that, because of the wide number of possible diseases involved, some of which are known to be extremely therapy resistant, the utility disclosed is inherently incredible and requires a high degree of proof of utility and a quite specific disclosure of how to use the claimed compositions with respect to the various disease states possibly contemplated in order to meet the requirements of 35 USC 101 and 112.

Regarding the section 101 rejection, it said:

> Although the treatment of cancer is not expressly disclosed in the specification, the totality of the evidence of record strongly suggests that it must be at least implicitly included within the disclosure of "lymphatic congestions."

The board noted that utility was particularly lacking in claim 1, which recites only families of plants, as opposed to genuses, since "[i]t is considered most unlikely that these varied plant types will yield the same drug extracts." It did not specifically address the examiner's rejection of all claims for failure to set forth the best mode, as required by section 112, or his rejection under section 101 for lack of proof of safety.

The board also sustained the examiner's rejection under section 112 (for lack of enablement) of claims 5, 9–11, 17, 20, and 21, based on disclosure in the specification that "ointment base" (recited in these claims) is an active part of the composition and not merely an inert carrier; and also based, in the case of claims 20 and 21, on disclosure that "sulphur-containing amino acid" is an active ingredient.

Finally, the board sustained the rejection under 35 U.S.C. § 102(b) of claim 14 over appellant's German application No. 1,931,-467, published December 23, 1970, as follows:

> The limitation [in claim 14] "between about 3% and about 35% of potassium arsenite" does not appear in appellant's parent application, and the invention including that limitation is thus not described therein. Example 7 of the above specified published application discloses a composition which is a species within the genus claimed in appealed claim 14, and thus the claim is anticipated.

## OPINION

### 1. Defining "Lymphatic Congestion"

The meaning of "lymphatic congestion" in appellant's specification is the threshold issue.

The specification discloses the intended use of the compositions to be the removal of "lymphatic congestions." The sections 101 and 112 rejections are based upon the construction of this term by the PTO. Although the specification does not set forth a specific definition of the term, it does disclose using the compositions for treating a symptom or condition in which the lymphatic vessels are clogged, or the lymph flow is otherwise retarded. Appellant argues that the words "lymphatic congestion" are common and well known and should be given their ordinary meaning;[3] that the term, as used in the specification, is limited to simple

---

3. *Webster's Third New International Dictionary* (unabr. 1971) provides the following definitions:

Congestion: "to gather into a mass . . . or to fill to excess so as to obstruct (as movement) or hinder"; "an excessive accumulation," *e. g.*, "an overaccumulation of blood in the blood vessels." *Id.* at 478.

Lymphatic: "conveying lymph . . . a vessel that contains or conveys lymph." *Id.* at 1350.

lymphatic congestion (clogged lymph vessels) and does not extend to the causes or results of lymphatic congestion (various therapy resistant diseases).

The board, on the other hand, found "that the term is intended to include lymphatic edemas resulting from various trauma including postoperative trauma and any number of disease states, including various forms of cancer"; further, that "the totality of the evidence of record strongly suggests that it [cancer] must be at least implicitly included within the disclosure of 'lymphatic congestion.'"

■ Nevertheless, we conclude that appellant's compositions are intended only for treatment of congestions or stoppages in the lymph system. The specification contains fifteen examples of such treatment. There is no mention of use in treating cancer. Appellant's brief sets forth the following explanation, which is entirely consistent with the specification and the dictionary definitions, *supra* note 3.

As a result of the clogging, lymph may not flow beyond the point of clogging but lymph continues to flow toward that point, thereby filling to excess with lymph the space in the tubes upstream of the point of stopage. As this overfilling continues the pressure it exerts on the walls of the tubes increases and the lymph passes through those walls, which are porous, and into the space between the cells in the surrounding flesh, thereby producing edemas and the like.

The record clearly shows that the compositions were developed for the "activation and regeneration of the lymphatic vessels and of the lymph nodes associated with them"; that one of the criteria for determining the effectiveness of the composition is the "tendency of the swellings of the tissues to decrease on account of the treatment"; that these compounds are "suited to diminish inflammatory changes of the lymphatic system and to remove congestions as well as products deposited in the

lymph"; and that the result of treatment is "the effective drainage of the entire lymphatic system."

■ The board's finding that appellant's compositions are intended for treatment of diseases that cause or result from lymphatic congestions apparently rests on a semantical interpretation of the word "covers" in the board's statement that appellant "acknowledged" in Paper No. 8 (amendment of January 14, 1975, in response to office action of August 12, 1974) "that the term lymphatic congestion covers all the various diseases listed by the examiner in his rejection as well as others." [4] Since the portion of Paper No. 8 containing this "acknowledgment" has not been included in the record, we must accept the finding as true. *Tiffany & Co. v. National Gypsum Co.*, 459 F.2d 527, 59 CCPA 1063, 173 USPQ 793 (1972). However, we need not and do not accept the board's interpretation of "covers" to mean that appellant's compositions are intended for treatment of such diseases when the specification and the record as a whole do not support such an interpretation. Also, we note that appellant's affidavit which accompanied Paper No. 8 contained no such "acknowledgement."

Appellant's compositions may be compared to the many over-the-counter ointment drugs which have the purpose of stimulating blood circulation. Use of an ointment to stimulate circulation and to decrease pain is not the same as treatment directed at curing the disease (*e. g.*, arthritis) which has caused the condition. Appellant's compositions are directed at stimulation of the circulation in the lymph system, which is not the same as treatment of the disease which caused the congestion in the lymph system or resulted from such congestion. Clearly, a physician can prescribe medicine for a patient with cancer (or other therapy resistant disease) to relieve him of a condition (*e. g.*, swelling of lymphatic vessels) accompanying that cancer without prescribing for the treatment of the cancer itself.

---

4. The diseases so listed are: Lymphadenitis, Lymphangitis, Lymphoma (a malignant disease), Catscratch disease (Nonbacterial Lymphadenitis, Benign Lymphoreticulosis) and Lymphedema.

### 2. The 35 U.S.C. § 101 Rejection
### (Claims 1–21)

#### a. Lack of Utility

 As previously related, the examiner and the board found that "the utility disclosed is inherently incredible." However, this finding is premised on an overly broad interpretation of "lymphatic congestion," discussed above. Construing the term more narrowly, as appellant has persuasively argued, the claimed utility is clearly not "incredible." [5]

This case is reminiscent of *In re Gazave*, 379 F.2d 973, 54 CCPA 1524, 154 USPQ 92 (1967), in which the claimed invention was directed to the treatment of "vascular disorders." The court held that the utility was not speculative, unbelievable, incredible, or factually misleading and said that where the assertion of usefulness appears to be believable on its face, the disclosed utility will be accepted as accurate.

In this case, there is ample evidence of utility needed to satisfy 35 U.S.C. § 101. Most convincing is the affidavit of Dr. Horst Veith which reports on a blind comparative study using one of appellant's compositions successfully.[6] There are other affidavits stating that the claimed "ointment has been and is prescribed at present by several hundred physicians for more than 2,000 patients every month." Further, the record contains a report of eight case studies detailing the case history, diagnosis, treatment, and effectiveness of the treatment of each patient.

We note that the PTO has not contested any of the offers of proof of utility submitted by appellant; nor has it presented any contrary evidence. Moreover, the PTO did not request information or research on appellant's compositions from the Secretary of Health, Education, and Welfare, which is specifically provided for in 21 U.S.C. § 372(d).[7]

#### b. Lack of Safety

The Solicitor notes that the board did not reverse the examiner's rejection for lack of utility because of the inclusion of ingredients that are extremely toxic, such toxicity demonstrating a lack of safety that is incompatible with utility under section 101. Appellant makes the point, however, that all medicines can be unsafe in excessive doses and that extremely toxic substances can be very valuable in appropriate doses.

 The case of *In re Anthony*, 414 F.2d 1383, 1394–95, 56 CCPA 1443, 1456–57, 162 USPQ 594, 603–04 (1969), provides a helpful analysis of what is necessary to meet the safety requirement under section 101:

No one, we suppose, would seriously maintain that, as a matter of policy, a

---

5. Cases involving the issue of whether the claimed utility was speculative, incredible, esoteric, factually misleading, or contrary to the common knowledge of persons of ordinary skill in the art, include: *In re Houghton*, 433 F.2d 820, 58 CCPA 732, 167 USPQ 687 (1970) (flying machine operating on "flapping or flutter function"); *In re Eltgroth*, 419 F.2d 918, 57 CCPA 833, 164 USPQ 221 (1970) (control of aging process); *In re Buting*, 418 F.2d 540, 57 CCPA 777, 163 USPQ 689 (1969) (treating cancer); *In re Ferens*, 417 F.2d 1072, 57 CCPA 733, 163 USPQ 609 (1969) (hair restorer); *In re Citron*, 325 F.2d 254, 51 CCPA 859, 139 USPQ 520 (1963) (treating cancer).

6. Dr. Veith was given five ointment samples (labelled A, B, C, D, and E) by Dr. Sichert (appellant). Only ointment A contained the claimed composition; during the test Dr. Veith did not know the composition of the ointments. Each ointment was used on ten patients. After eight to ten days, those patients treated with ointment A showed a marked decrease in the swelling of the treated tissues; whereas, the patients treated with ointments B through E showed little, if any, improvement. Thereafter, these latter patients were treated with ointment A. "The result was that 8 to 10 days after the change to the effective ointment A likewise measurable decreases of the swellings have been determined."

7. 21 U.S.C. § 372(d) provides:
 (d) Information on patents for drugs.
 The Secretary is authorized and directed, upon request from the Commissioner of Patents, to furnish full and complete information with respect to such questions relating to drugs as the Commissioner may submit concerning any patent application. The Secretary is further authorized, upon receipt of any such request, to conduct or cause to be conducted, such research as may be required.

composition unsafe for use by reason of extreme toxicity to the point of immediate death under *all* conditions of its sole contemplated use in treating disease of the human organism would nevertheless be useful within the meaning of the patent laws.

But at the same time it must be recognized that "safety" is a relative matter, and that absolute proof of complete safety is realistically impossible. As this court pointed out in *In re Hartop*, 311 F.2d 249, 50 CCPA 780, 135 USPQ 419 (1962) . . . :

> . . . True it is that such substances would be *more* useful if they were not dangerous or did not have undesirable side effects, but the fact remains that they *are* useful, useful to doctors, veterinarians and research workers, useful to patients, both human and lower animal, and so are useful within the meaning of 35 U.S.C. § 101. The use of drugs in medicine is frequently a matter of balancing risks to save a life.

> And Congress has given the responsibility to the FDA, not to the Patent Office, to determine in the first instance whether drugs are sufficiently safe for use that they can be introduced in the commercial market . . . .

> . . . . .

> . . . The board also correctly recognized that the fact that many "useful" drugs exhibit some degree of toxicity or side effects "would not provide a basis for refusal of a patent on such drugs as without utility" under § 101. The presence of a certain degree of danger or risk attendant on the use of a drug does not necessarily mean that the subject matter is not useful within the meaning of the patent law because of that danger or risk. [Footnotes omitted.]

Thus, *Anthony* points to only a minimum level of safety to meet section 101. *In re Watson*, 517 F.2d 465, 475–76, 186 USPQ 11,

19–20 (Cust. & Pat.App.1975). We are satisfied that appellant's specification and affidavits are adequate to establish this minimum level of safety, since they demonstrate that when the claimed compositions are used properly, there are no harmful side effects.[8]

In view of the foregoing, the rejection of claims 1–21 under 35 U.S.C. § 101 is reversed.

### 3. The 35 U.S.C. § 112 Rejections

#### a. Enablement—"Lymphatic Congestions" (Claims 1–21)

The board concluded that "[t]hese facts [lymphatic congestion "covers" many disease states, including cancer] strongly support the examiner's position that the original specification did not contain a sufficient disclosure to enable one of ordinary skill in the medical arts to treat the extremely large variety of diseases contemplated with the claimed compositions without the exercise of undue experimentation . . . ." What the examiner said (in his Answer before the board) is as follows:

> The disclosure sets forth that the present invention involves important technical advance as compared to remedies of the prior art and also indicates that while in case of the treatment of diseases of the blood-circulation numerous efficient remedies are available to the physician there is a sensible need of a remedy which efficiently removes the pathologic changes in the lymphatic system. Accordingly, the use disclosed is of such nature that the art is unaware of successful treatments with chemically analogous compositions and therefore a more complete statement of how to use is necessary and proper.

> It is readily apparent that contrary to Appellant's position *the application does not define or state which disease conditions are encompassed by the terminology "lymphatic congestions" nor does the*

---

8. Of particular significance are the blind comparative study discussed in note 6, *supra*, and the eight case studies of patients.

*specification state "the nature of" same.* [Emphasis added.]

■ As this court said in *In re Marzocchi*, 439 F.2d 220, 224, 58 CCPA 1069, 1073, 169 USPQ 367, 370 (1971):

[I]t is incumbent upon the Patent Office, whenever a rejection on this basis is made, to explain *why* it doubts the truth or accuracy of any statement in a supporting disclosure and to back up assertions of its own with acceptable evidence or reasoning which is inconsistent with the contested statement. Otherwise, there would be no need for the applicant to go to the trouble and expense of supporting his presumptively accurate disclosure.

*Cf. In re Gazave, supra.* In order to affirm this rejection, there must be evidence or reasoning of record which is inconsistent with a critical statement in the disclosure. We find none. The PTO's only argument is that treatments of the lymph system are not well known, so that appellant must disclose which diseases are encompassed by the term "lymphatic congestions." However, there is no need for such a disclosure when the meaning of that term is limited to simple lymphatic congestion (clogged lymph vessels), as we have earlier concluded. Moreover, appellant's specification provides adequate guidance on how to use his compositions in the treatment of this condition. See *In re Stephens*, 529 F.2d 1343, 188 USPQ 659 (Cust. & Pat.App.1976); *In re Armbruster*, 512 F.2d 676, 185 USPQ 152 (Cust. & Pat.App.1975); *In re Rainer*, 347 F.2d 574, 52 CCPA 1593, 146 USPQ 218 (1965). Several examples even provide information on the appropriate doses and what variations can be made in these doses in the case of "severe and desolate cases." The PTO has cited no evidence or reference

that contradicts or is inconsistent with any supporting statement of the disclosure.[9] Accordingly, the rejection of claims 1–21 for lack of enablement due to use of the term "lymphatic congestions" is reversed.

*b. Enablement—Plant Extracts (Claim 1)*

In the case of claim 1, however, the board supported its rejection for lack of enablement with the following statement:

We note that claim 1 recites families of plants as opposed to genuses. The taxonomy of plants is not based on drug content but on leaf form, flower type, etc. Thus, the family Solanaceae, for example, includes belladonna, petunia, hot pepper and sweet pepper. It is considered most unlikely that these varied plant types will yield the same drug extracts. Similarly, within the family Umbelliferae are found anise, caraway, celery, dill and parsley.

Such reasoning is inconsistent with the efficacy of the mixtures of the drug extracts within the ratios of claim 1[10] and establishes a prima facie case of lack of enablement,[11] a result that would not follow from a showing or allegation of the mere possibility of inclusion of inoperative embodiments in broad claims. See *In re Sarett*, 327 F.2d 1005, 1019, 51 CCPA 1180, 1199, 140 USPQ 474, 486 (1964); Einhorn, *The Enforceability of Patent Claims Encompassing Some Inoperative Species*, 45 J.P. O.S. 716 (Oct. 1963); Goodman, *The Invalidation of Generic Claims by Inclusion of a Small Number of Inoperative Species*, 40 J.P.O.S. 745 (Oct. 1958). Therefore, the burden shifted to appellant to show that one of ordinary skill in the art could practice the claimed invention without undue experimentation. See *In re Marzocchi, supra*.

---

**9.** Neither is there any evidence suggesting that appellant's compositions are toxic at the doses disclosed in the specification. The Solicitor makes a general allegation of toxicity, but there is no specific challenge to any disclosed composition—only to single ingredients contained therein when used in "large" doses.

**10.** The numerous permutations of drug extracts from the five families designated by the

claim, with only fifteen examples for guidance, further support the board's reasoning.

**11.** If the PTO's burden were not met by the reasoning of the board here, the statement quoted earlier from *In re Marzocchi, supra*, would be meaningless. See *In re Angstadt*, 537 F.2d 498, 505, 190 USPQ 214, 220 (Cust. & Pat.App.1976) (Miller, J., dissenting).

■ In determining what constitutes undue experimentation, many factors are taken into account,[12] including the guidance provided by the specification for selecting those embodiments of the invention which achieve the disclosed utility. Such guidance is essential where the invention involves an unpredictable art, as in the instant case. See *In re Fisher*, 427 F.2d 833, 57 CCPA 1099, 166 USPQ 18 (1970), where the court said that the scope of enablement varies inversely with the degree of unpredictability of the involved factors.[13]

■ All that appellant has done is point out that drug extracts of some of the preferred members of each plant family have similar physiological effects. There is no proof that *all* or even a substantial number of the drug extracts of members of the families of claim 1 have similar physiological effects. Nor has appellant provided (1) any evidence that one skilled in the art would know which of the member plants' extracts would be operative, or (2) any guidance to enable one skilled in the art to choose the operative plant extracts. Thus, undue experimentation is indicated, and the rejection of claim 1 under 35 U.S.C. § 112 must be affirmed.

*c. Enablement—"Ointment Base" (Claims 5, 9–11, 17, 20, and 21)*

These claims include extracts from each of the plant families and "from about 76.1 to about 83.3% of ointment base." Appellant's specification discloses that the "ointment base" is an active ingredient in the compositions. However, the only guidance on how to select it is: "The preferred active ingredient of vital necessity for the cellular respiration is an ointment base containing from about 76.1 to about 83.3% of linoleic acid or linolenic acid in combination with a sulphur-containing amino acid and the biocatalyzer cytochrome C." In his rejection, the examiner stated:

While, generally, the term ["ointment base"] would not be criticized if the specification indicated that same was not critical and that any conventional ointment base may be utilized to practice the invention, the instant application states that the ointment base employed enhances the activity in certain cases. Therefore, the specific ointment base employed is deemed necessary herein particularly in view of the internal use of such compositions and the alleged synergistic effects.

■ For the specification to be enabling, it must provide sufficient guidance for one skilled in the art to determine which ointment bases (or ingredients thereof) have the necessary activity-enhancing property. We are satisfied that the specification provides sufficient enabling support for claims 20 and 21. Claim 20 recites an ointment base containing linoleic acid; claim 21, an ointment base containing linolenic acid. Both claims recite that the ointment base contains a sulphur-containing amino acid and the biocatalyzer cytochrome C. Therefore, this rejection of claims 20 and 21 is reversed.

However, claims 5, 9–11, and 17 recite only an "ointment base." There is no evidence showing that one skilled in the art would know what ingredients (other than those recited in claims 20 and 21) would favorably affect cellular respiration. Also, we are persuaded that the disclosure of "preferred active ingredient of vital necessity for the cellular respiration" does not provide sufficient guidance to select other operative ointment bases without undue experimentation, considering particularly that an unpredictable art is involved. See *In re Fisher, supra*. We note that appellant does not argue that one skilled in the art would know which ointment bases (or ingredients thereof) have the desired effect on the cellular respiration. Indeed, the definition of ointment base submitted by appellant to

12. See concurring opinion in *In re Colianni*, 561 F.2d 220, 223, 195 USPQ 150, 152 (Cust. & Pat.App.1977), and cases cited therein.

13. In this appeal, the invention involves physiological activity, which was specifically listed in *Fisher*.

the examiner [14] underscores the difficulty of determining a proper ointment base. Therefore, this rejection of claims 5, 9–11, and 17 is affirmed.

### d. Enablement—"Sulphur-containing Amino Acid" (Claims 20 and 21)

The Solicitor argues that appellant has abandoned this issue by failing to argue it. There is no question that the issue was preserved for appeal.[15] However, an issue raised below which is not argued before this court, even if properly brought here by the reasons of appeal, is regarded as abandoned and will not be considered. *In re Wiechert*, 370 F.2d 927, 936–37, 54 CCPA 957, 968, 152 USPQ 247, 254 (1967), and cases cited therein. In *Wiechert*, the court considered the "record, briefs, and oral arguments" to see whether the issue was "argued." In doing so here, we note that appellant argues this issue in his reply brief, so that it cannot be maintained that he abandoned the issue. *In re Farrow*, 554 F.2d 468, 473 n. 2, 193 USPQ 689, 692 n. 2 (Cust. & Pat.App.1977).

On the merits, appellant argues that the phrase "sulphur-containing amino acids" in claims 20 and 21 is "well known, to the extent of being the heading of a German patent classification, and means any amino acid containing sulphur." However, we agree with the board's statement:

In view of the extremely large number of compounds of differing properties that this recitation reads on and the absence of a single specific disclosure of a sulphur-containing amino acid, appellant's invention can not [sic] be said to be enabled with respect to this limitation.

Also, there is no evidence that one skilled in the art would have knowledge of the proper compounds. This rejection of claims 20 and 21 is, therefore, affirmed.

### e. Best Mode (Claims 1–21)

The examiner's final rejection establishes [16] that all claims were rejected for failing to set forth the best mode, thus:

Claims 1–21 are rejected under 35 USC 112, first paragraph, and Rule 71 as stated in Paper No. 4. . . . Contrary to Applicants' [sic] opinion the application does not fully satisfy the requirements of the Rule 71.

Paper No. 4 states:

The specification is objected to as being insufficient and defective in not complying with Rule 71. . . . The specification does not teach or disclose how to use the invention nor is the best mode contemplated for carrying out the invention setforth [sic].

---

14. Appellant submitted the following translated excerpt from *Chemistry Lexicon* at 4,581 (6th ed.):

Ointment base. Skin creams and healing-ointments consist of water, an ointment base, emulsifiers and special additions, for example, hormones, vitamins, dyestuffs, aromatic substances, preservatives against sunburn, healing substances and the like. The ointment bases confer to the creams, healing-ointments, etc. the unctuous semi-solid consistency, they are emulsified in the water by means of the emulsifiers. . . . the following organic materials alone or in mixture are used as ointment bases: Vegetable and animal fats and oils, stearin, wool-fat, lanette wax, fatty alcohols, lanoline, spermaceti, waxes, sorbitol, alginates, pectins, tylose, adulsion, tragacanth, agar, gelatine, cocoabutter, waxes, paraffin, vaseline, silicones, polyethylene oxides (for example, cremolan, lutrol), etc. The industry also furnishes ointment bases ready for use with admixed emulsifier (examples: Tegin, Tegacid). As inorganic ointment bases the following have been suggested: silica gel, solution of alcali silicate, bentonites, montmorillonites, aluminum hydroxide gels, magnesium hydroxide gels (see Meyer in SÖFW 1950, page 345 to 346); these are mostly used in mixture with organic ointment bases. About new ointment bases see Neuwald, F. in Dtsch. Apoth. Ztg. 1963, pages 653 to 656.

15. Point four of the Notice and Reasons of Appeal recites that the board erred in sustaining the rejection of claims 20 and 21 under 35 U.S.C. § 112, 1st para. All reasons of rejection under the cited statute are considered to be preserved. See D. Dunner, *Court Review of Patent Office Decisions: CCPA* § 2.03[c] at 2–14 (1976), and cases cited therein.

16. See 37 CFR § 1.196(a); *In re Castner*, 518 F.2d 1234, 1239, 186 USPQ 213, 218 (Cust. & Pat.App.1975); *In re Bush*, 296 F.2d 491, 496, 49 CCPA 752, 759–60, 131 USPQ 263, 267 (1961).

Also, we note that the Examiner's Answer included the following statement: "The specification also does not teach the best mode of using the invention." Since the board did not specifically reverse the best mode rejection ("best mode" is not mentioned in the board's opinion), the rejection is deemed to have been affirmed. *In re Watson, supra,* 517 F.2d at 472, 186 USPQ at 16 (Cust. & Pat.App.1975); *In re Pye,* 355 F.2d 641, 53 CCPA 877, 148 USPQ 426 (1966).

The language of appellant's Notice and Reasons of Appeal[17] is broad enough to preserve the correctness of the rejection for consideration by this court. *In re Castner, supra,* 518 F.2d at 1238, 186 USPQ at 217. Also, we consider that appellant has argued this issue, having stated in his brief:

> The compositions may be in the form of ointments, suppositories, capsules, injections and sprays, each of which is the best mode known of using the invention for certain parts of the body.

Furthermore, at oral argument, when questioned about the best mode, appellant's counsel referred to the fifteen examples in the specification.

█ This rejection is similar to the one in *In re Bosy,* 360 F.2d 972, 976, 53 CCPA 1231, 1236, 149 USPQ 789, 792 (1966), where "the error of failing to 'analyze exactly what appellant's invention is in the instant case,' . . . has resulted in the additional error [by the PTO] of requiring a best mode be set forth of details not relating to the essence of the invention." Moreover, appellant's specification sets forth numerous examples, many with exact doses and a discussion regarding the method of treatment. The examiner's conclusory statement that the specification does not teach the best mode of using the invention is unaccompanied by evidence or reasoning and is entirely inadequate to support the

rejection. *Compare Union Carbide Corp. v. Borg-Warner Corp.,* 550 F.2d 355, 193 USPQ 1 (6th Cir. 1977). Accordingly, the rejection of claims 1–21 for failure to set forth the best mode is reversed.

### 4. The 35 U.S.C. § 102(b) Rejection (Claim 14)

█ As stated earlier, the board rejected claim 14[18] over appellant's German application for anticipation, because the limitation in the claim of "between about 3% and about 35% of potassium arsenite" does not appear in appellant's parent application (serial No. 43,947), upon which appellant relies for a filing date of June 5, 1970, to antedate his German application (December 23, 1970). Example 7 of the German application discloses a composition (7.5 grams of potassium arsenite is added to 30 grams of the composition) which is a species of the claimed genus (3–35%) in claim 14; appellant's parent application discloses the same species in Example 9.

The board affirmed the examiner's rejection, which was based on inadequate disclosure of the claimed invention in the parent application, thus precluding use of its June 5, 1970, filing date.

The disclosure in the parent application (in addition to Example 9) reads as follows:

> According to a particular embodiment of the invention the composition also contains arsenicum or compounds of arsenicum. By this means an additional very important enhancement of the activity is achieved. Examples of arsenicum or compounds of arsenicum, respectively, which may be contained in the compositions according to the invention are colloidal arsenicum, arsenious acid and potassium arsenite.

Obviously, such a disclosure, coupled with Example 9, does not describe the limitation of "between about 3% and about 35%."

---

17. "The Board [and hence the examiner in his Answer] erred: . . . 2. In holding that the rejection (of claims 1–21 inclusive) under the first paragraph of 35 U.S.C. 112 is sound."

18. In his Notice and Reasons of Appeal, appellant erroneously indicated that claim 16 was rejected under 35 U.S.C. § 102(b); whereas,

claim 14 was the claim rejected. In considering this issue, we note that this court has traditionally been liberal in finding that the Notice and Reasons of Appeal expressly or impliedly touch a ground of rejection. See D. Dunner, *supra* § 2.03[c] at 2–14.5 to 2–14.6, and cases cited therein.

See, *e. g., In re Blaser*, 556 F.2d 534, 194 USPQ 122 (Cust. & Pat.App.1977); *In re Wertheim*, 541 F.2d 257, 191 USPQ 90 (Cust. & Pat.App.1976); *In re Smith*, 458 F.2d 1389, 59 CCPA 1025, 173 USPQ 679 (1972); *In re Lukach*, 442 F.2d 967, 58 CCPA 1233, 169 USPQ 795 (1971).

Since claim 14 is not entitled to the parent's filing date, it is anticipated by the published German application, which discloses a species of the claimed genus (3–35%) in claim 14. *In re Smith, supra; In re Lukach, supra.* As this court said in *Lukach, id.* 442 F.2d at 970, 58 CCPA at 1236, 169 USPQ at 797:

> [It is] the law that the description of a single embodiment of broadly claimed subject matter constitutes a description of the invention for anticipation purposes . . ., whereas the same information in a specification might not alone be enough to provide a description of that invention for purposes of adequate disclosure. [Citations omitted.]

The rejection of claim 14 is affirmed.[19]

### Summary

In summary, we *reverse* the following rejections: claims 1–21 under 35 U.S.C. § 101; claims 1–21 under 35 U.S.C. § 112 for lack of enablement regarding the term "lymphatic congestion"; claims 1–21 under 35 U.S.C. § 112 for failure to disclose the best mode; and claims 20 and 21 under 35 U.S.C. § 112 for lack of enablement regarding the term "ointment base." We *affirm* the following rejections: claim 1 under 35 U.S.C. § 112 for lack of enablement regarding selection of plant extracts; claims 5, 9–11, and 17 under 35 U.S.C. § 112 for lack of enablement regarding the term "ointment base"; claims 20 and 21 under 35 U.S.C. § 112 for lack of enablement regarding the term "sulphur-containing amino acid"; and claim 14 under 35 U.S.C. § 102(b).

*MODIFIED.*

---

**19.** The board, in failing also to sustain the examiner's rejection of claim 18 (dependent on claim 14) under section 102(b), seems to have overlooked the fact that claim 18, like claim 14, is not entitled to the parent's filing date. The separate patentability of claim 18 based on its added limitations has not been argued.