**In re Meir STRAHILEVITZ.**

**Appeal No. 81–563.**

United States Court of Customs and Patent Appeals.

Jan. 15, 1982.

J. Philip Polster, St. Louis, Mo., for appellant.

Joseph F. Nakamura, Sol., and Fred W. Sherling, Washington, D.C., for Patent and Trademark Office.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

The decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") sustaining the rejection of claims 36–48 [1] as unsupported by an adequate disclosure required by 35 U.S.C. § 112, first paragraph, is *reversed.*

---

1. Application serial No. 761,290, for "Immunoassay and Treatment Methods, Particularly of Psychoactive Drugs," filed January 21, 1977; continuation of serial No. 255,154, filed May 19, 1972.

## BACKGROUND

*Invention*

Appellant's invention relates to methods and devices for removing a hapten, antigen, or antibody from the blood of a living mammal.

A hapten is a small molecule which does not by itself produce antibodies but which, when conjugated to a carrier protein or other macro-molecular carrier, induces in a recipient animal or human the production of antibodies that are specific to the small molecule. For example, certain psychoactive drugs, such as LSD, heroin, and tetrahydrocannabinol, can function as haptens. When an antibody (a relatively large immunoprotein) contacts the hapten or antigen to which it is specific, it tightly binds the hapten or antigen. It is this specific binding property of antibodies which is used by appellant to remove haptens, antibodies, or antigens from blood. Claim 44, the broadest appealed claim, from which claims 45 and 46 depend, reads:

> An immunological method for removing from a living mammal a hapten in the blood of said mammal, comprising connecting in the blood circulatory system of said mammal a hapten-removing device, said device comprising passage means for said blood; an antibody to said hapten in

said device; and exposure means in said device for exposing said hapten to said antibody and for preventing said antibody from entering said circulatory system.

Appealed method claims 36–39 involve linking to a matrix an antibody to a hapten and passing blood over the matrix. The antibody removes the hapten from the blood by binding the hapten.[2] Claim 40 is directed to a method for removing an *antibody* from the blood of a living mammal which is passed over an *antigen* linked to a matrix; claim 41 involves an antibody linked to a matrix to remove an *antigen* from blood.

Claims 42 and 43 involve a method for removing a hapten or an antigen from blood through an immunodialysis process.[3] A semipermeable membrane, permeable to haptens or antigens and impermeable to antibodies, separates a patient's blood from a solution containing antibodies to the target molecules. Because the antibodies specifically bind target molecules that diffuse from the patient's blood through the semipermeable membrane, a gradient across the membrane is present for the molecule, which continues to diffuse from the blood to the dialysis solution as long as the solution contains antibodies which are free to bind the target molecules. Claims 47 and

2. Claim 36 reads:
> An immunological method for removing from a living mammal a hapten in the blood of said mammal, comprising a step of connecting in the blood circulatory system of said mammal a hapten-removing device, said device comprising inlet means and outlet means for connecting said device into said circulatory system, chamber means for defining a flow passage between said inlet means and said outlet means, a matrix in said chamber, and an antibody to said hapten linked to said matrix, said antibody binding said hapten to said matrix as said blood passes through said chamber, and a further step of separating said hapten from said antibody to regenerate said antibody for further use in said device.

3. Claim 42 reads:
> An immunological method for extracting from a living mammal a hapten in the blood of said mammal, comprising
> (1) connecting in the blood circulatory system of said mammal a hapten-removing device, said device comprising a first chamber

and a second chamber; a semipermeable membrane separating said first chamber from said second chamber; inlet means and outlet means for connecting said first chamber in the circulatory system of said mammal; a liquid phase containing antibodies to said hapten in said second chamber, said membrane being permeable to said hapten and being impermeable to said antibodies; and closed regenerative means connected in a fluid circuit with said second chamber, said regenerative means comprising a third chamber,
> (2) drawing at least a portion of said liquid phase from said second chamber to said third chamber,
> (3) changing the pH of said liquid phase in said third chamber for releasing said antibody from said hapten, and
> (4) returning said antibody to said second chamber and preventing said hapten from returning to said second chamber.

48 are essentially directed to devices for practicing claims 42 and 43.

*Proceedings Below*

The examiner rejected the claims as based upon an insufficient disclosure under 35 U.S.C. § 112, first paragraph, stating:

> The disclosure is essentially an invitation to experiment. No specific examples are given. No human treatment (in fact no animal treatment) is described. The specification is replete with statements as to what *may* be done. No dialysis or adsorption data [have] been presented.
>
> . . . .
>
> . . . [A]ppellant urges "nearly universal applicability" for *selectively* removing chemical species. If there is in fact universal applicability, with selectivity, appellant should have inserted numerous (50 to 100 for instance) examples into the specification.
>
> . . . .
>
> Appellant urges that no working example is required and that instructions to a technician are not required. But it has already been pointed out that appellant believes his device has *universal* applications (and the claims are just about that broad). Admittedly, one skilled in the art is a Ph.D., but even with such a high level of skill, such a person would need detailed guidance to practice the claimed alleged *universal* invention.

The board took a somewhat different approach:

> [A]ppellant admits . . . the disclosure contains no "operative example". While we recognize that specific examples are not necessary to meet the requirements of Section 112, *In re Gay*, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962), when present, they do provide good evidence that the disclosure is enabling and that the invention may be performed without undue experimentation. In our view, the material most descriptive of the claimed methods and apparatus, is that presented in examples 12 and 13, wherein systems are defined for the removal of haptens, antigens and antibodies from the circulatory system. At best, the descriptive material is a generalized explanation of figures 6 and 7 in the drawings, and except for the regeneration step, provides no specific or even general guidelines for the treatment. The claimed methods . . . involve a complicated and complex series of reaction conditions that apparently require specifically related haptens, antigens and antibodies to operate effectively. We fail to find in the disclosure adequate instruction as to how these selections are to be made and in our view such selections would not be readily apparent or obvious to those of ordinary skill in the related art. Also required in various claims is the use of a matrix for use in binding the antibodies; however, we see no disclosure adequate to define such production or even the materials that are compatible in use. The specification also fails to teach or even suggest the antibodies or antigens that may be used with the appropriate haptens and we see no disclosure that would lead to or suggest a proper means of selecting the appropriate membranes for use in the removal devices. In short, it appears that the appellant has developed a concept of how a variety of prior art procedures may possibly be combined in a single method . . . and then retreated to leave those in the art with the task of experimentation to see if the method can be made to operate as set forth. . . . Here, appellant has presented no descriptive material that in our view is sufficient to provide a proper instruction in the manner of either developing the apparatus as claimed or the method of using same. The wide variety of variables that are inherent in the process, and for which the disclosure provides no basis for evaluation, leads us to the conclusion that operation of the method as claimed would involve an undue amount of experimentation and we will therefore sustain the rejection.

Thus, the board questioned whether the specification enabled selection and preparation of haptens, antigens, and antibodies; preparation of the matrix; selection of the dialysis membranes; and selection of parameters of the dialysis process.

1232

## OPINION

*Burden of Proof*

■ A threshold issue is whether the PTO met its burden of proof in calling into question the enablement of appellant's disclosure. This burden required that the PTO advance acceptable reasoning inconsistent with enablement. Thereupon, the burden would shift to *appellant* to show that one of ordinary skill in the art could have practiced the claimed invention without undue experimentation. *In re Sichert*, 566 F.2d 1154, 1161, 196 USPQ 209, 215 (CCPA 1977).

■ The examiner reasoned that because of the breadth of the invention, a large number of examples (50 to 100) would be *required* to enable one of ordinary skill in the art to make and use the invention. 35 U.S.C. § 112, first paragraph. We recognize that working examples are *desirable* in complex technologies and that detailed examples can satisfy the statutory enablement requirement. Indeed, the inclusion of such examples here might well have avoided a lengthy and, no doubt, expensive appeal. Nevertheless, as acknowledged by the board, examples are not *required* to satisfy section 112, first paragraph. *See, e.g., In re Stephens*, 529 F.2d 1343, 188 USPQ 659 (CCPA 1976); *In re Borkowski*, 57 CCPA 946, 422 F.2d 904, 164 USPQ 642 (1970); *In re Gay*, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962). Therefore, the examiner's statement that the "nearly universal applicability" alleged for the invention necessitated numerous examples was erroneous. Although the invention is applicable to a large variety of haptens and antigens, the examiner offered no reason why these different compounds would require different techniques or process parameters.

■ However, the examiner (and the board) also reasoned that enablement was not present because no dialysis or adsorp-

tion (of the antibody or antigen to the matrix) data were presented, and we are persuaded that this was sufficient to shift the burden to appellant to establish that a person of ordinary skill in the art could have practiced the invention without undue experimentation.

*Enablement*

The dispositive issue is whether appellant's disclosure, considering the level of ordinary skill in the art as of the date of appellant's application, would have enabled a person of such skill to make and use appellant's invention without undue experimentation.

■ Appellant explains that his invention resides in combining the known prior art techniques of hemodialysis or hemoperfusion with immunochemical dialysis and immunochemical adsorption. He properly relies on literature citations to establish both the level of ordinary skill in the art and the fact that the techniques necessary to practice his invention were known in the art.[4] *In re Eynde*, 480 F.2d 1364, 178 USPQ 470 (CCPA 1973).

A. Selection and Preparation of Haptens, Antigens, and Antibodies

Appellant argues that methods for forming antibodies which are specific to particular haptens and antigens were well known prior to his filing date. In his specification, he states:

> Immunization of rabbits with conjugates in complete Freund's Adjuvant are carried out by a similar procedure to the one described by Strahilevitz et al, supra. The preparation of antisera and globulin fractions are also described in this reference. The antibodies may be purified by known methods such as those set out in *Immunologic Methods in Steroid Determination.*

4. Some of the patents cited by appellant to show the level of ordinary skill in the art issued after the May 19, 1972, filing date of his *parent* application. These patents, originally cited by the examiner as section 102(e)/103 prior art against the claims, cannot be relied upon as evidence of enablement if appellant wishes to

retain the benefit of his parent application's filing date. *See In re Gunn*, 537 F.2d 1123, 190 USPQ 402 (CCPA 1976), and *In re Budnick*, 537 F.2d 535, 190 USPQ 422 (CCPA 1976). However, as will be developed *infra*, reliance upon these patents is unnecessary.

He then gives a specific example of preparing an antibody to tetrahydrocannabinol, referring to a method described in *Immunologic Methods in Steroid Determination* (Peron & Caldwell ed. 1970) for conjugating the compound to a protein, and detailing the injection of "[r]abbits, sheep or other suitable animals" with the conjugate, giving concentration, dosage, and frequency of injection data.

Pinckard & Weir, *Equilibrium Dialysis and Preparation of Hapten Conjugates* in *Handbook of Experimental Immunology* 493 (D. Weir ed. 1967), cited in appellant's specification and made a part of the record in the parent application, details the preparation of protein-hapten conjugates, injection of the conjugates into animals, and recovery of antibodies to the haptens from the animals. It is clear from this disclosure that selection and preparation of related haptens, antigens, and antibodies involve routine and well-known techniques. Indeed, at oral argument, the Solicitor acknowledged that techniques for preparing antibodies to specific haptens and antigens were known in the art.

### B. Preparation of Matrix with Bound Antibodies

In example 13 of appellant's specification, appears the following statement:

As shown in Figure 7, the apparatus for this method consists of a column 26 which includes a matrix 37 to which a binding species is linked. The binding species is a hapten, antigen (including a hapten conjugated to a carrier) or antibody which reacts specifically with the species which is to be removed from the blood. The linkage of the binding species to the matrix 37 may preferably be directly to the matrix, as when the matrix is made of a synthetic polymer such as polystyrenelatex. The linkage may also be through a suitable solid phase coating on the matrix. The antibody is then linked to the coating by one of the known methods for the preparation of immunoadsorbents, for example by a modification of one of the methods of Campbell (Campbell et al, Proc. Nat. Acad. Sci., U.S.A., *37*, p. 575 (1951); Malley and Campbell, J. Am. Chem. Soc. *85*, p. 487 (1963)). If any chance exists that the solid phase adsorbent may break loose from the matrix 37, suitable filters are necessary in the system. The matrix may simply be the wall of the (plastic) column if the length of the column is sufficient to provide the required surface area for interaction at the blood-binding species interface.

Additionally, appellant points out that appropriate matrices and techniques for binding antigens or antibodies thereto were well known in the art, as evidenced by Weetall, U.S. Patent No. 3,652,761, cited by the examiner in support of a rejection under 35 U.S.C. § 103 which was reversed by the board. Weetall discloses that it was known in the art to couple antigens to cellulose and its derivatives, polyaminopolystyrene, dextrans, and polyaminoacids to remove antibodies from serum. This patent also teaches a novel method for coupling antigens or antibodies to glass with the use of a silane coupling agent.

### C. Dialysis Membranes

The position of the board and the Solicitor is that appellant has provided no disclosure regarding selection of the dialysis membranes required to practice the subject matter of claims 42, 43, 47, and 48. However, appellant's specification states:

Such membranes, having various pore sizes, and thus which are permeable to molecules of various sizes are commercially available .... The semi-permeable membrane is chosen to be of such a porosity and permeability as to be permeable to small molecules like the intoxicating hapten of interest, but is not permeable to large molecules present in the blood of the patient such as serum proteins.

Selection of the membranes, therefore, is based upon their porosity and the relative molecular sizes[5] of the antibody and the hapten or antigen. Weetall, *supra*, teaches

5. Molecular size is a function of molecular weight.

that antigens generally have a molecular weight of 10,000 or higher, and that antibodies have molecular weights of 160,000 to 1,000,000. Haptens are much smaller.[6] Galletti et al., in U.S. Patent No. 3,619,423, disclose a process in which enzymes in a dialysis fluid remove undesirable substances from blood. The blood is separated from the dialysis fluid by a semipermeable membrane having a pore size which will pass compounds having a molecular weight of less than 10,000. The 100,000 molecular weight enzymes cannot cross the membrane. Thus, these references clearly indicate that selection of semipermeable membranes on the basis of pore size, as suggested by appellant's specification, was a technique known in the art prior to appellant's filing date.

### D. Dialysis

Appellant states that a person of ordinary skill in the art would know appropriate flow rates and other parameters for performing dialysis, citing Galletti et al., *supra*, and Rosenbaum, Kramer, Raja, & Boreyko, *Resin Hemoperfusion*, 284 New England J. Med. 874 (1971). Galletti et al. teach a hemodialysis method which uses enzymes rather than antibodies to remove materials from blood. Dialysis parameters are disclosed, including a flow rate of 200 ml./min. Rosenbaum et al. teach a method in which blood is passed through a column at 300 ml./min. for three hours to remove barbiturates from the blood. These references disclose typical dialysis and related data in methods similar to those of appellant. There is no reason to believe that these parameters would not also be applicable to appellant's methods, as he contends.

6. For example, heroin, LSD, and tetrahydrocannabinol all have molecular weights of between 300 and 400.

7. The Solicitor has not seriously attempted to refute appellant's positions on the enablement questions raised by the board and the examiner, on the proper interpretations of the references, or on the applicability of the references to the practice of the claimed invention. Instead, the Solicitor raises a new argument by challenging the *operability* of the invention in removing antigens or haptens from whole blood. However, it is well settled that, on appeal to this court, the Solicitor cannot raise a

 In view of all the foregoing, we hold that appellant's disclosure would have enabled a person of ordinary skill in the art to make and use appellant's invention without undue experimentation.[7]

The decision of the board is *reversed*.

REVERSED.

new ground of rejection or apply a new rationale to support the rejection affirmed by the board. *In re Armbruster*, 512 F.2d 676, 185 USPQ 152 (CCPA 1975). Even if we were to consider the Solicitor's new argument, we would have to reject it, because the Solicitor has shown no reason for doubting appellant's statements, in his specification, that the process will remove material from whole blood as stated. Indeed, the references cited by the Solicitor which show antibodies removing antigens or haptens from serum are convincing that appellant's process will operate with whole blood.